1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT FOR THE

7                    EASTERN DISTRICT OF CALIFORNIA

8

9    ISSA ZACHARIA,                    )    1:06-cv-892  AWI SMS
                                       )
10                       Plaintiff,    )    ORDER ON DEFENDANT'S
        v.                             )    MOTION FOR SUMMARY
11                                     )    JUDGMENT
     CITY OF MADERA, et. al.,          )
12                                     )
                                       )    (Doc. No. 75)
13                       Defendants.   )
     _____)

14

15

16        This case stems from the investigation of Plaintiff Issa Zacharia ("Zacharia") by

17   Defendant Ignatius Chinn ("Chinn") for state criminal law firearms violations.  In March 2007,

18   Zacharia was acquitted in federal court of the charge of being a felon in possession of a firearm.

19   Following his acquittal, Zacharia filed suit in this Court against numerous defendants.  The only

20   defendant left is Chinn.  Zacharia alleges violations of 42 U.S.C. § 1983 and 42 U.S.C. § 1985.

21   Chinn now moves for summary judgment.  For the reasons that follow, Chinn's motion will be

22   granted.

23                            **FACTUAL BACKGROUND**[1]

24        Chinn has been employed as an Investigator for the San Francisco Police Department

25   since March 2008.  DUMF 1.  Chinn left his employment with the California Department of

26   Justice (Cal-DOJ) in March 2008.  DUMF 2.  He was employed by the CalDOJ for 7 ½ years and

27

28   _____
     [1]A reference to "DUMF" refers to "Defendant's Undisputed Material Fact."  A reference to "PRDUMF"
     refers to "Plaintiff's Response to Defendant's Undisputed Material Fact."  Plaintiff did not file separate undisputed
     facts, but instead responded to the facts submitted by Defendant.

held the position of Special Agent Supervisor when he left Cal-DOJ.  Id. Chinn was assigned to the Cal-DOJ Firearm Division (now Bureau) from approximately February 2000, until his departure in March 2008.  DUMF 3.  He was involved in at least 200 firearms investigations involving illegal transactions, illegal machine gun conversions, and assault weapons sales and possession violations.  Id.

Zak's is a business owned and operated by Zacharia, in Madera, California.  DUMF 5. Guns are sold at Zak's.  See id.  In 2002, Zacharia had a manager working for him named Andrea, who continues to work with him.  DUMF 6.

In January 2002, Chinn learned that Zacharia was a gun dealer when he was asked to investigate Zacharia's involvement in drop shipping machine guns for purchase by the Madera Police Department.  DUMF 7.  On January 24, 2002, Chinn was informed by Commander Steve Frazier and Chief of Police Jerry Noblett, both of the Madera City Police Department, that Zacharia had a felony conviction in Arkansas that could not be confirmed, but was well known in literary circles and the press.  DUMF 8.  Chief Noblett stated they had tried to get a certified copy of Zacharia's conviction, but the Arkansas authorities had not complied with the request.  Id. The purchase and sale of the machine guns did not materialize and the investigation was stopped. See DUMF 7.  A memorandum from Chinn dated May 2002 stated that Madera County District Attorney Ernie LiCalsi and Cal-DOJ Deputy Attorney General Nancy Palmieri had informed Chinn that there was a conflict in the law regarding who could sell to law enforcement agencies and who had to obtain a Cal-DOJ permit prior to selling machine guns to law enforcement agencies.  See Plaintiff's Ex. 1.  The memo eventually concluded, "I request that this case be closed pending further information of [sic] evidence."  Id.

In June 2002, Chinn conducted a further investigation into Zak's for possessing and selling unpermitted and unregistered assault weapons.  DUMF 9.[2]  On June 16, 2002, Chinn

---

[2]Plaintiff disputes DUMF 9 by arguing that Chinn conducted no investigation, but instead directed Madera police officers to attempt to entrap Zacharia.  Plaintiff cites Exhibit 1, but that exhibit is an investigative report authored by Chinn.  The report is dated May 3, 2002, and requests that the case/investigation against Zacharia be closed.  See Plaintiff's Ex. 1.  Exhibit 1 does not contradict DUMF 9.  As for Zacharia's argument that Chinn set in motion a plan to entrap Zacharia, there is no evidence cited in support of such a contention.  Mere unsupported assertions do not create genuine disputes.  See Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002); Tarin v. County of Los Angeles, 123 F.3d 1259, 1265 (9th Cir. 1997).  DUMF 9 is undisputed.

learned from Nathaniel Barrell (who is now deceased, see DUMF 14), an analyst with Cal-DOJ, that Barrell had received a phone call from a female named Andrea who identified herself as the sales manager for Zak's.  DUMF 10.[3]  Andrea purportedly called Barrell and told him that a police officer asked if Zak's could sell the officer an AR-15,[4] which is a legally restricted assault weapon that requires a gun dealer to have a special assault weapons permit in order to sell. See DUMF's 11, 12.[5]  Barrell informed Chinn that Zak's California firearm dealer number did not have the requisite permit to sell assault weapons.  See DUMF 13; PRDUMF 13.  In June 2000, Zacharia had applied for a state permit to allow him to sell assault weapons.  See DUMF 15.

On June 21, 2002, Chinn conferred with Mike Small[6] of the Cal-DOJ Firearms Licensing and Permits Unit (FLPU).  DUMF 16.  Small told Chinn that Zacharia had applied for an assault weapons sales permit in 2000 (dangerous weapons permit).  Id.  Zacharia applied for the dangerous weapons permit so he could sell assault weapons.  See DUMF 17; PRDUMF 17. Small reviewed the administrative file held by Cal-DOJ and confirmed that Zacharia submitted applications for Certificates of Eligibility ("COE") to Cal-DOJ to obtain a license as a firearms dealer in the State of California, and succeeded in obtaining the COE's.[7]  DUMF 19.  Having

---

[3]Plaintiff disputes DUMF 10 by referencing his arguments against DUMF 9.  For the same reasons that DUMF 9 is not sufficiently disputed, DUMF 10 is also not sufficiently disputed.

[4]Although there is no further explanation, the wording of the DUMF suggests that Andrea was checking on the ability of Zak's to lawfully sell firearms to the police officer.

[5]Plaintiff disputes the precise wording of DUMF 12, which deals with permits and AR-15's.  However, there does not appear to be a dispute that a special permit was required in order to sell an AR-15.

[6]Between February 1995 and October 2007, Small was the Manager of the FLPU.  See DUMF 18.  In that position, he supervised and managed firearms licensing and permitting.  Id.  He was responsible for processing, issuing, denying, revocation of, and keeping records of the following: Assault Weapons Registrations; Basic Firearms Safety Certificates; Carry Concealed Weapon Eligibility Clearances; Centralized List of Firearms Dealers; Certificate of Eligibility; Dangerous Weapons Licensing and Permits; Firearms Manufacturers License and Centralized List of Firearms Manufacturers.  Id.

[7]A full background check is not done when an applicant seeks a COE to obtain a California gun sales license.  DUMF 20.  For a COE applicant, at the time Zacharia was applying, Cal-DOJ policy was to issue the COE when a history of arrest lacked a disposition.  DUMF 21.  The assigned Cal-DOJ analyst was to continue to monitor the criminal history record for an ultimate disposition and, if the disposition was a prohibiting offense, revoke the COE at that time.  Id.

1  complied with the additional required licenses and permits, Zacharia became a licensed gun

2  dealer in California.  Id.  Small's review of the administrative file indicated that Zacharia

3  submitted an "Applicant/Business History for Dangerous Weapons Permit And/Or License"

4  application in 2000, i.e. a dangerous weapons permit application, wherein he referenced

5  obtaining an assault weapons sales permit.[8]  DUMF 23.  Zacharia did not complete the process to

6  obtain the "dangerous weapons permit" that would have enabled him to obtain an assault

7  weapons sales permit.  Zacharia did not respond to a request for additional information and

8  effectively abandoned the dangerous weapons permit application.  Id.  Specifically, Small told

9  Chinn that during the dangerous weapons permit background investigation,[9] Cal-DOJ agents had

10  found information that Zacharia had a felony conviction in Little Rock Arkansas, Pulsaski

11  County.[10]  DUMF 24.  A request for confirmation of this conviction and a request for

12  certification were made to the Pulaski County Criminal Clerks' office, but that office did not

13  respond.  Id.  Small told Chinn that Zacharia was informed of the existence of a felony

14  conviction, and that Zacharia had said he was aware that this information was expunged from his

15  record.  DUMF 25.  Small informed Chinn that Zacharia was asked to produce these expunged

16  documents before the permit process for the assault weapons could proceed.  DUMF 26.  Small

17  informed Chinn that Zacharia never supplied the information and abandoned the dangerous

18  weapons permit process, but continued to be a regular California licensed firearms dealer.  Id.

19      Chinn's investigation into the lack of an assault weapons permit and the possession of

20  unregistered assault weapons led to the issuance of search warrants in June 2002.[11]  DUMF 28.

21

22  [8]Small is also familiar with Zacharia's application since Small supervised this matter.  Strictly speaking, there is no "dangerous weapons permit" per se.  The submission of the "Applicant/Business History for Dangerous Weapons Permit And/Or License," application, once processed, and a finding of good cause made, allows for the

23  issuance, for example, of an assault weapons permit.  DUMF 23.

24  [9]A full background check is performed on an applicant seeking an assault weapons permit.  Also, good cause is required to issue an assault weapons permit.  DUMF 22.  Cal-DOJ policy during Small's tenure was that

25  good cause could not be shown until there was a disposition on an arrest record.  Id.

26  [10]Zacharia disputes whether he actually had a felony conviction.  However, whether Zacharia actually had a

27  felony conviction does not change the fact that Small told Chinn that such a conviction existed.

28  [11]Chinn did not initiate his own investigation into the felony conviction; instead he pursued the investigation on the lack of an assault weapons permit and the possession of unregistered assault weapons.  See DUMF 27.

On or about June 21, 2002, Zacharia's place of business was searched for assault weapons, and approximately twenty-five (25) assault weapons were found.  See DUMF 29.  The search warrant of June 2002, and the discovered unpermitted and unregistered assault weapons, led to criminal charges against Zacharia in the Madera County Superior Court.  See DUMF 30.  These criminal charges were resolved in May 2008 when Zacharia pled no contest to misdemeanor counts under California Penal Code § 12280(b).  DUMF 31.

While the June 2002 charges were pending, on June 6, 2006, Commander Steve Frazier of the Madera City Police Department told Chinn that he now had a certified copy of Zacharia's felony conviction from Pulaski County, Arkansas.  DUMF 32.[12]  On June 7, 2006, Chinn received certified copies of court records pertaining to the alleged Pulaski County felony conviction ("Pulaski Documents").  See DUMF 33.  Zacharia had been charged with a felony for an alleged violation of Arkansas Statutes Annotated § 41-707, Criminal Conspiracy, in the matter State of Arkansas v. Issa Zacharia, Pulaski County Circuit Court, Case No. CR-832623 (hereinafter, "the Pulaski Crime").  See DUMF 34.  Zacharia had pled guilty to a felony charge of conspiracy on December 7, 1984, in the Circuit Court of Pulaski County, Arkansas.  See DUMF 35.[13]  The Pulaski Documents indicate that the Pulaski County Circuit Court suspended Zacharia's sentence the same day, December 7, 1984.  See Plaintiff's Ex. 8; Defendant's Ex. G.

Chinn provided a copy of the certified records of the Pulaski Crime to Cal-DOJ Deputy Attorney General Alison Merrilees[14] ("Merrilees") for her review.[15]  DUMF 42.  As part of

---

[12]Zacharia disputes whether he actually had a felony conviction.  Again, whether Zacharia actually had a felony conviction does not change the fact that Small told Chinn that such a conviction existed.

[13]Plaintiff disputes DUMF 35 in part by arguing that the guilty plea was a product of the unavailability of a nolo contendere plea.  However, insufficient evidence has been cited in support of this assertion.  DUMF 35 is undisputed.

[14]Merrilees is an attorney at law admitted to practice before all courts of the State of California and is an active member of the State Bar of California.  DUMF 43.  She has been Deputy Attorney General since July 2005.  See id.  She is assigned to represent the Bureau of Firearms (formerly Firearms Division), and has been so assigned since throughout her tenure with the Attorney General's Office.  Id.

[15]Chinn gave the following documents regarding the Pulaski Crime to Merilees to review: a Clerk's Certificate, see DUMF 37, a Register of Actions, see DUMF 38, a Felony Information, see DUMF 39, a Condition of Release Upon Suspension of Imposition of Sentence, see DUMF 40, and a Plea Statement.  See DUMF 41.  These are the "Pulaski Documents."

1   Merrilees' duties, she provides legal advice to both sworn and non-sworn staff of the Bureau of

2   Firearms regarding the interpretation of state and federal firearm laws.  DUMF 44.  Because of

3   the variety of the statutory duties of the Bureau of Firearms relating to firearms, it is a routine

4   part of Merrilees's job as the Bureau of Firearms' legal counsel to analyze whether a person who

5   applies to purchase a firearm is eligible to do so under both state and federal law.  DUMF 47.  It

6   is also a routine part of Merrilees's job to analyze whether a person selling firearms in California

7   is properly licensed, whether a person who is licensed as a federal and state firearms "dealer" is

8   acting within the scope of state and federal law, and whether any person who has a permit or

9   license issued by the Bureau of Firearms is acting pursuant to the terms and conditions of the

10  permit or license.  Id.  The sworn peace officers assigned to the Bureau of Firearms routinely

11  consult with Merrilees when they have legal questions about state and federal law, and

12  applications in their criminal investigations of the violation of state firearms laws.  DUMF 48.

13  Merrilees reviewed the copies of the certified records of the Pulaski Crime and informed Chinn

14  that there were no expungements or pardons reflected in the records.  DUMF 49.  Merrilees

15  recalls telling Chinn that she was not an expert on Arkansas law.  DUMF 50.[16]  She advised him

16  that it would be prudent to check with such an expert about whether Arkansas law restored

17  Zacharia's right to possess firearms in Arkansas.  Id.

18        On June 7, 2006, Chinn contacted the Arkansas State Attorney General's Office by

19  telephone and spoke with Kent G. Holt ("Holt"), who identified himself as an Assistant Attorney

20  General.  DUMF 51. Holt is an attorney licensed in the state of Arkansas and is an Assistant

21  Attorney General with the Attorney General's Office in Arkansas.[17]  DUMF 53. Chinn asked

22  Holt to review Zacharia's Pulaski County court file to see if the felony conviction had been

23

24        [16]Plaintiff states that DUMF 50 is undisputed, subject to the clarification that it has been his position that
      Merrilees did not assure Chinn that the Pulaski Crime was a felony.  See PRDUMF 50.  However, the "clarification"
25    does nothing to call into question the substance of DUMF 50.  DUMF 50 is undisputed.

26        [17]Holt has been an Assistant Attorney General in the Criminal Division of the Arkansas Attorney General's
      Office since August 1991.  DUMF 54.  Holt's primary job responsibilities as an Assistant Attorney General include
27    serving as a special prosecutor in cases against the State in both state and federal cases, including appellate work.
      DUMF 55.  Holt was licensed to practice law in 1986 and went to work with the Office of the Prosecutor in Pulaski
28    County in 1988.  DUMF 56.  In 1990, Holt was the Division Chief for the Pulaski County - 4th Division Circuit
      Court, before joining the Arkansas Attorney General's Office in 1991.  DUMF 57.

expunged, pardoned, or reduced.  DUMF 52.[18] Chinn asked Holt to determine whether there was a finding of guilty or some sort of conviction based on the certified Pulaski County court file provided by Chinn, regarding the Pulaski Crime.  DUMF 58.

Holt recognized the court records provided by Chinn, based on Holt's practice in the Circuit Court in Pulaski County, and the records seemed regular on their face in that they appeared to be what they were.  DUMF 59.  Holt went to the library and looked in the newspaper to see what some of the facts of the case were, because he noticed that in the court documents, one of the names of the defendants had been whited-out.  DUMF 60.  Holt examined the court documents, including the plea statement.  DUMF 61.  Based on Holt's experience and understanding, a plea statement is what a defendant fills out when they withdraw a plea of not guilty and enters a plea of guilty and there is some disposition of the case.  Id.  The plea statement in the court documents for the Zacharia matter indicated that Zacharia had entered a guilty plea to a conspiracy charge, with signatures appearing on the defendant's signature line and attorney's signature line.  DUMF 62.[19]  In reviewing the court documents in the Zacharia matter, there was no indication known to Holt that Zacharia's conviction had been expunged. DUMF 63.  Holt determined from the documents that it appeared Zacharia had pleaded guilty and received a suspended imposition of sentence.[20]  DUMF 64.  Holt concluded that, absent any indication in the documentation provided to him, Zacharia had, under Arkansas law, the status of a felon.  DUMF 65.

On or about June 12, 2006, Holt informed Chinn and Merrilees of his findings,

---

[18]Plaintiff disputes DUMF 52 by stating that Chinn's inquiry was not to determine whether there was a felony conviction, but was to determine whether what Chinn believed to be felony had been expunged, pardoned, or reduced.  First, DUMF 52 by its terms states that Chinn asked whether there was a pardon, expungement, or pardon. Second, DUMF 58 states that Chinn asked whether there was a finding of guilt "or some sort of conviction."  DUMF 58.  Thus, Chinn did ask whether there was a conviction.  DUMF 52 is not disputed.

[19]Plaintiff disputes DUMF 62 by referencing his dispute to DUMF 35.  For the same reasons that the DUMF 35 is not actually disputed, DUMF 62 is not actually disputed.

[20]In a declaration, Holt explained that there was no indication that the felony had been reduced, nor was there any indication that entry of a guilty plea had been deferred under Act 346 of 1975, which contained provisions for first offenders.  DUMF 64.  Additionally, Holt declared that the Emergency Clause accompanying Act 346 describes its application as to "youthful offenders."  Id.

determinations, and conclusion, that Zacharia's sentence was suspended but that his conviction was a felony that had not been reduced, and there were no indications that Zacharia's conviction had been expunged nor a governor's pardon entered. DUMF 66; Chinn Dec. ¶ 29; Holt Dec. ¶ 16; Merrilees Dec. ¶ 10. Holt had spoken to Merrilees and Chinn on the telephone. <u>See</u> Merrilees Dec. ¶ 10. Holt later provided Chinn with a letter confirming that the suspended sentence was still a felony. <u>See</u> DUMF 67; Holt Dec. ¶ 17. Specifically, the letter read, "The fax . . . regarding Issa Zacharia may clear up some of the questions you posed last week. The suspended sentence is just the sentence. To paraphrase Shakespeare, 'a felony, is a felony, is a felony.' Let me know if you need anything else . . . ." Plaintiff's Ex. 2.

Based on Chinn and Merrilees's discussion with Holt, the letter from Holt, Merrilees's review of Zacharia's criminal history in Chinn's investigative file, and Merrilees's knowledge of California law and the effect of an out-of-state conviction on a person's eligibility to lawfully possess firearms in California,[21] Merrilees informed Chinn that Zacharia had been convicted of a felony in Arkansas. DUMF 68.[22] Based on all of this information, Merrilees informed Chinn that Zacharia was ineligible for a COE issued by Cal-DOJ, and therefore ineligible to be a licensed firearms "dealer" in California. <u>Id.</u> Furthermore, Merrilees informed Chinn that Zacharia was prohibited from purchasing or even possessing firearms in California because he was "convicted of a felony under the laws of . . . the State of California, or any other state," and that doing so would be a felony in California. <u>Id.</u> In light of the information from Holt and Merrilees, and aware that Zacharia was a California gun dealer, Chinn initiated an investigation of Zacharia for violation of California gun licensing and sales laws. <u>See</u> DUMF 70.

Based upon earlier investigations regarding Zacharia's gun sales business, Chinn was

---

[21] In a declaration, Merilees explained that California considers a person to be "convicted of a felony" based upon an out-of-state conviction and therefore prohibited from possessing or purchasing a firearm in California pursuant to section 12021(a)(1), even after the underlying conviction has been dismissed and the person's right to possess firearms has been restored in that state. DUMF 50. California can carry out "its own public policy of prohibiting convicted felons within its borders from possessing firearms merely because defendant could lawfully possess firearms in [another state]." Nevertheless, in her opinion and practice, it is always helpful to understand the law of the other state in order to understand how that law applies in California. <u>Id.</u>

[22] Plaintiff disputes this DUMF by making an argument against summary judgment. That is, Plaintiff does not dispute the substance of the DUMF, rather he disputes the conclusions that flow from the DUMF. The legal significance of the DUMF is separate from the issue of whether the DUMF is disputed. DUMF 68 is undisputed.

aware Zacharia possessed weapons both for personal use and for sale, which would be prohibited if Zacharia was a convicted felon. DUMF 72. On June 13, 2006, Chinn confirmed Zacharia's Centralized Dealer Information and that he was still doing business under the name "Zak's" in Madera, California. See DUMF 74. Chinn confirmed that, since July 12, 1995, Zacharia was the sole licensee and operator of his licensed firearms sale location. See DUMF 75. Chinn confirmed gun sale activity that showed that from June 14, 2005 to June 8, 2006, Zacharia had sold one hundred and two (102) firearms. DUMF 76. A review of state databases indicated that Zacharia may have transferred six handguns from inventory to his personal possession and use, which is a violation of concealed weapon permit laws. See DUMF's 77-83. Chinn knew from serving the previous search warrant that Zacharia had the only key to the firearm storage room at Zak's, which suggested to Chinn that Zacharia had control over firearms and could constitute a felon in possession. See DUMF 84. Chinn also found that twelve handguns had been purchased by Zacharia after December 7, 1984 (the date Zacharia pled guilty in the Pulaski Crime). See DUMF 85. Chinn reviewed Zacharia's 2000 application for a dangerous weapons permit and saw that Zacharia had answered "no" to the question, "Have you ever been convicted, cited, or charged with an offense, including traffic violations and juvenile arrest?" See DUMF's 86-89.

Based on Chinn's investigation of Zacharia, Chinn sought a search warrant for evidence that Zacharia owned, possessed, or controlled firearms and for unlawfully possessed firearms, among other things, to be served at Zacharia's residence and at Zak's. See DUMF 91. On June 21, 2006, the Madera County Superior Court authorized and issued a search warrant to search the person of Zacharia, the premises of Zak's, and Zacharia's residence. DUMF 92. On June 21, 2006, Chinn participated in the execution of the search warrant at Zak's. DUMF 93. Zacharia was handcuffed, but not arrested. See id.; see also DUMF 94.

On September 14, 2006, following grand jury testimony from Chinn, an indictment was filed in the U.S. District Court, Eastern District of California, charging Zacharia with, among other things, a violation of 18 U.S.C. § 922(g)(1), commonly referred to as felon in possession of a firearm. DUMF 103. The indictment alleged that Zacharia was convicted on December 7, 1984, in the Circuit Court of Pulaski County and Perry Counties, State of Arkansas, Case No. 83-

2623, for the crime of conspiracy.   DUMF 104.  Zacharia acknowledged in his federal criminal

trial that he was arrested on November 21, 1983, charged with criminal conspiracy, was found

guilty of criminal conspiracy on the December 7, 1984, and received a suspended imposition of

sentence, ten years probation and court costs.  See DUMF 69.  Zacharia was acquitted on March

23, 2007, of the charges brought on the federal indictment.[23]  See DUMF 107.

At Zacharia's deposition in this case, when asked, "Why do you believe Mr. Chinn

discriminated against you?", Zacharia stated that Chinn used the term, "Lebanese.  Not just

Lebanese, because I was – it was even worse than being Lebanese.  I was a terrorist, because I'm

a Lebanese gun dealer and a pilot."  DUMF 95.  As to whether Chinn called Zacharia a terrorist,

Zacharia asserted: "All these things.  Not specifically that word or that word.  I mean he didn't

say one word 'terrorist.'"  DUMF 96.  Zacharia asserted: "After the handcuffs, and after he

[Chinn] threw the papers, and after [Chinn] said, "You're out of business .... I finally got you .... I

should have got you four or five years ago ... I knew all along you're a terrorist, something

Lebanese."  DUMF 97.  At no time during the execution of the search warrant on June 21, 2006,

nor at any other time whatsoever, did Chinn refer to Zacharia as "terrorist," "Lebanese terrorist,"

or in any other manner connoting terrorist or ethnic ties.  DUMF 98.[24]


## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine

issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

judgment bears the initial burden of informing the court of the basis for its motion and of

identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

---

[23]Zacharia did not file a petition to seal for expungement of his guilty plea in the Pulaski Crime until the previous Monday before his testimony in federal court.  See DUMF 106.  Additionally, Zacharia moved in limine for a determination of the existence of the alleged underlying conspiracy, i.e. the Pulaski Crime.  See DUMF 107. Apparently the motion was denied because a jury acquitted Zacharia.  See Document 32 in 1:06-CR-310 OWW.

[24]Zacharia disputes DUMF 98 by stating, "Undisputed in as much as to the exact quoted language. However, it was implied to the Plaintiff."  PRDUMF 98.

absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is

sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson,

477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant

must affirmatively demonstrate that no reasonable trier of fact could find other than for the

movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of

proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential

element of the non-moving party's claim or by merely pointing out that there is an absence of

evidence to support an essential element of the non-moving party's claim.  See James River Ins.

Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire

& Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails

to carry its burden of production, then "the non-moving party has no obligation to produce

anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the

moving party meets its initial burden, the burden then shifts to the opposing party to establish

that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103.  The

opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must

instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for

trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting

Fed. R. Civ. Pro. 56(e)).

The evidence of the opposing party is to be believed, and all reasonable inferences that

may be drawn from the facts placed before the court must be drawn in favor of the opposing

party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad,

1   Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air,

2   and it is the opposing party's obligation to produce a factual predicate from which the inference

3   may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008);

4   UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

5   material fact does not spring into being simply because a litigant claims that one exists or

6   promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d

7   15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

8   Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

9   "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or

10  'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427

11  F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

12  circumstances to consider materials that are not properly brought to its attention, but the court is

13  not required to examine the entire file for evidence establishing a genuine issue of material fact

14  where the evidence is not set forth in the opposing papers with adequate references.  See

15  Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San

16  Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails

17  to produce evidence sufficient to create a genuine issue of material fact, the moving party is

18  entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

19

20  **I.**     **SECOND CAUSE OF ACTION – FOURTH AMENDMENT**

21       1.     Probable Cause

22       *Defendant's Argument*

23       Chinn argues that probable cause existed.  While charges were pending from the 2002

24  warrant, Chinn was informed through Frazier that copies of the Arkansas felony documents had

25  been obtained.  Chinn received the documents, had Merrilees review them, and then contacted

26  the Arkansas Attorney General's office.  After several days, Holt informed Chinn and Merrilees

27  of his findings and conclusion.  Holt concluded that Zacharia had the status of a felon.  Based on

28  discussions with Chinn and Holt, Holt's letter, Chinn's investigative file, and her knowledge of

how California law treats out-of-state convictions, Merrilees informed Chinn that Zacharia had been convicted of a felon in Arkansas.  Merilees told Chinn that Zacharia: (1) would be ineligible for a COE; (2) would be ineligible to be a firearms dealer; (3) could not possess a firearm; and (4) would be in violation of Penal Code § 12021(a)(1) (felon in possession of a firearm) if he possessed firearms.  From his investigation, Chinn knew that Zacharia had the only key to the firearms locker at Zak's, and that Zak's had sold 102 firearms between June 2005 and June 2006.

Further, a review of licences and records indicated that six handguns had not been listed under Zacharia's concealed weapons permits.  The evidence suggested that the six handguns had been moved from Zak's inventory into Zacharia's personal possession.  This is a violation of the concealed weapons permit laws, irrespective of Zacharia's felony status.

Finally, Chinn's review of Zacharia's 2000 assault weapons permit indicated that Zacharia lied when he answered that he had not been convicted, cited or charged with an offense. In light of the felony documents, Zacharia's answer is false.

The totality of this information provided probable cause for criminal activity.

*Plaintiff's Opposition*

Zacharia argues that the crux of the case is that Chinn recklessly and indifferently failed to investigate and corroborate loose legal conclusions prior to representing to a judge that he had proof that Zacharia was a felon in possession of a firearm.  Chinn's investigation was inadequate in that he made no independent inquiries into the effect that Zacharia's 1984 record would have had in Arkansas.  Chinn simply parroted the conclusions of two attorneys without considering the fact that Zacharia had passed previous background checks.  Further, reliance on Merrilees is unreasonable as she knows nothing about Arkansas law, and reliance on Holt's letter is unreasonable because the letter is ambiguous and Chinn never sought clarification.  Had Chinn inquired as to what Holt's letter really meant, he would have learned about many Arkansas case law and attorney general opinions that conclude that Zacharia had the right to possess firearms under the Arkansas codes.  Arkansas law does not regard persons treated as Zacharia was treated in 1984 as being "felons."  See State v. Warren, 345 Ark. 508 (2001); State v. Ross, 344 Ark. 364 (2001).

1      *Legal Standard*

2          "The warrant clause of the Fourth Amendment requires 'probable cause, supported by

3      Oath or affirmation' to justify the issuance of a search warrant." United States v. Meek, 366 F.3d

4      705, 712 (9th Cir. 2004).  Specifically, a police officer must establish "by sworn evidence

5      presented to a magistrate that probable cause exists to believe that an offense has been committed

6      and that items related to that offense, such as fruits of the crime, will be found on the premises

7      sought to be searched at the time the warrant is issued." United States v. Rabe, 848 F.2d 994,

8      997 (9th Cir. 1988).  Probable cause for a search warrant "means a fair probability that

9      contraband or evidence of a crime will be found in a particular place based on the totality of the

10     circumstances." United States v. SDI Future Health, Inc., 568 F.3d 684, 703 (9th Cir. 2009).

11     "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy

12     information sufficient to lead a person of reasonable caution to believe that an offense has been

13     or is being committed by the person being arrested." Rodis v. City & County of San Francisco,

14     558 F.3d 964, 969 (9th Cir. 2009); John v. City of El Monte, 515 F.3d 936, 940 (9th Cir. 2008).

15     Courts look to "the totality of the circumstances known to the arresting officers, to determine if a

16     prudent person would have concluded there was a fair probability that the defendant had

17     committed a crime." John, 515 F.3d at 940; see Hart v. Parks, 450 F.3d 1059, 1066 (9th Cir.

18     2006).

19         "The probable cause standard is incapable of precise definition or quantification" and is

20     "a fluid concept - turning on the assessment of probabilities in particular factual contexts - not

21     readily, or even usefully, reduced to a neat set of legal rules." Rodis, 558 F.3d at 969.  "While

22     conclusive evidence of guilt is not necessary to establish probable cause, mere suspicion,

23     common rumor, or even strong reason to suspect are not enough." Ramirez v. City of Buena

24     Park, 560 F.3d 1012, 1023 (9th Cir. 2009).  Except for the element of specific intent, "probable

25     cause does not require the same type of specific evidence of each element of the offense as would

26     be needed to support a conviction." Rodis, 558 F.3d at 969.  That is, "probable cause" does not

27     require "certainty," does not require a "preponderance of the evidence," and does not require a

28     *prima facie* showing, it simply requires a "fair probability." See United States v. Gourde, 440

1  F.3d 1065, 1069, 1073 (9th Cir. 2006) (en banc).

2      "Police may rely on hearsay and other evidence that would not be admissible in a court to

3  determine probable cause." Hart, 450 F.3d at 1067.  Further, officers may "draw on their own

4  experience and specialized training to make inferences from and deductions about the cumulative

5  information available to them that might well elude an untrained person." John, 515 F.3d at 940;

6  Hart, 450 F.3d at 1067.  "As a corollary . . . of the rule that the police may rely on the totality of

7  facts available to them in establishing probable cause, they also may not disregard facts tending

8  to dissipate probable cause." Ramirez, 560 F.3d at 1023-24.  Nevertheless, the "fact that other

9  inferences are possible does not mean that there is a triable issue of fact as to whether there was

10 probable cause;" Hart, 450 F.3d at 1067, "law enforcement officers do not have to rule out the

11 possibility of innocent behavior." Ramirez, 560 F.3d at 1024.  Additionally, "an arresting

12 officer's state of mind (except for the facts that he knows) is irrelevant to the existence of

13 probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004); see also John, 515 F.3d at

14 940.

15      *Discussion*

16      The principle dispute is whether there was probable cause that Zacharia was a felon in

17 possession of firearms, a violation of California Penal Code § 12021.  The penal code reads in

18 relevant part:  "Any person who has been convicted of a felony under the laws of the United

19 States, the State of California, or any other state, government, or country . . . and who owns,

20 purchases, receives, or has in his or her possession or under his or her custody or control any

21 firearm is guilty of a felony."  Cal. Pen. Code § 12021(a)(1).  Both parties agree that Zacharia

22 possessed or was in possession of firearms.  The disagreement is whether probable cause existed

23 that Zacharia was a felon, due to the Pulaski Crime, in possession of firearms.

24      In 2002, Chinn was informed by Small that Zacharia had acknowledged a conviction in

25 Arkansas.  See DUMF 25.  Zacharia had apparently abandoned his dangerous weapons permit

26 application when Small asked Zacharia to send a copy of a pardon or expungement.  See DUMF

27 26.  In 2006, Chinn received certified copies of criminal documents from Pulaski County.  The

28 Pulaski Documents indicated a guilty plea to felony conspiracy, but also indicated a suspended

sentence.  See Plaintiff's Exs 7, 8.  There is nothing on the face of the Pulaski Documents that expressly indicates that Zacharia is not a felon.[25]  Chinn consulted with Merrilees, whose job duties include advising Bureau of Firearms officers, like Chinn, in the course of firearms and licensing investigations about state and federal firearms laws.  See DUMF's 44-48.  Upon Merrilees's advice, Chinn then contacted Holt.  See DUMF's 50, 51.  As a deputy attorney general for the state of Arkansas, Holt clearly had an expertise in Arkansas law that Merrilees lacked.  See DUMF's 50, 54-57.  Holt examined the records, did his own investigation, and then spoke to Chinn and Merrilees on the telephone.  See DUMF's 59-64; Merrilees Dec. ¶ 10.  Holt's conclusion was that Zacharia was a felon based on the Pulaski conviction, and he related that conclusion to both Chinn and Merrilees.[26]  See DUMF 65; Chinn Dec. ¶ 29; Holt Dec. ¶ 16; Merrilees Dec. ¶ 10.  Merrilees then told Chinn that, considering the investigative file, the information and conclusions of Holt, and California law, Zacharia was a felon and could not possess or sell weapons.  See DUMF's 68, 70.

Probable cause does not require certainty, or even a prima facie case – it requires only a fair probability.  See Gourde, 440 F.3d at 1069, 1073.  The Pulaski Documents, combined with the information from Small, the opinions of Holt, and the opinions of Merrilees are sufficient to establish probable cause, that is a "fair probability," Gourde, 440 F.3d at 1073, that Zacharia was a felon based on the Pulaksi Crime.  See id.; Cal. Pen. Code § 12021(a)(1);[27]  DUMF's 49, 50, 66-68; Plaintiff's Exs. 7, 8.  This information was relayed by Chinn in his warrant application.  See Defense Ex. J.  In examining the warrant application, which included copies of the Pulaski

---

[25]Recently, a California appellate court stated that California is not required to apply another state's law in determining whether a person is a felon for purposes of Penal Code § 12021(a)(1).  See People v. Lewis, 164 Cal.App.4th 533, 537 (2008).  Further, a person may be considered a felon under Penal Code § 1201(a)(1) based on an out of state conviction, even if the person has had his right to possess firearms restored in that state.  See id.; People v. Shear, 71 Cal.App.4th 278, 288-89 (1999).  Thus, how Arkansas may view Zacharia does not necessarily determine how California may view him.

[26]Holt also concluded that there was no indication of a deferred sentence under Arkansas Act 346 of 1975.  See DUMF 64.  The Arkansas Supreme Court in State v. Warren, 345 Ark. 508 (2001) relied on the application of Act 346 of 1975 to reverse convictions for the crime of felon in possession of a firearm.  In State v. Ross, 344 Ark. 364 (2001), the Arkansas Supreme Court discussed a later version of Act 346 of 1975.  Ross and Warren are both cited by Zacharia.

[27]Again, no party challenges the "possession" aspect of Penal Code § 12021(a)(1).

16

Documents and Holt's correspondence, the Madera Superior Court correctly concluded that there was probable cause, i.e. a "fair probability," Gourde, 440 F.3d at 1073, that an offense under Penal Code § 12021(a)(1) "has been committed and that items related to that offense, such as fruits of the crime, will be found on the premises sought to be searched at the time the warrant is issued." Rabe, 848 F.2d at 997.  Chinn had probable cause, and his search warrant application established probable cause.

Zacharia contends that Chinn failed to properly consider the fact that Zacharia had passed background checks and was a licenced firearms dealer.  It is true that an officer cannot disregard evidence that tends to dissipate probable cause.  Ramirez, 560 F.3d at 1023-24.  However, Zacharia does not point to which of his passed background investigations should have dissipated probable cause.  Zacharia's unsupported assertions are not sufficient evidence.  See Bryant, 289 F.3d at 1167; Tarin v. County of Los Angeles, 123 F.3d 1259, 1265 (9th Cir. 1997).   What has been presented to the Court is that Zacharia had obtained a COE, but did not obtain a dangerous weapons permit.  See DUMF's 19, 26.  Small has declared that full background checks were not done with respect to COE's, but that they were done with respect to dangerous weapons permits.  See Small Dec. ¶¶ 4, 6; DUMF's 20, 22.  Small also declared that, when confronted with the Pulaski Crime as part of the dangerous weapons permit process, Zacharia acknowledged the crime as expunged, but did not send additional requested information and dropped the application process.  See Small Dec. ¶¶ 9, 10; DUMF's 25, 26.  Zacharia has not sufficiently explained how, or produced evidence that shows that, probable cause was dissipated by obtaining a COE, given the limited background checks associated with COE's.[28]

Zacharia criticizes Chinn's reliance on the letter from Holt and argues that Chinn should have sought clarification.  The evidence indicates that Chinn, Holt, and Merrilees spoke on the telephone and that Holt explained his conclusion that Zacharia was a felon and that the Pulaski Crime was a felony.  See Merrilees Dec. ¶ 10; see also Chinn Dec. ¶ 29; Holt Dec. ¶ 16.  The letter was sent at Merrilees's request and was meant to be a confirmation of their telephone

---

[28]The Court notes that the warrant application described Small's information and stated that Zacharia remained a licensed gun dealer.  See Defense Ex. J.

1   conversation.  See Merrilees Dec. ¶ 10; Holt Dec. ¶ 17.  Thus, the letter was not coming out of a

2   vacuum or without context.  It was coming as a follow through or memorialization of the

3   telephone conversation.  However, even assuming that Chinn should have sought clarification

4   about Holt's letter, Holt confirmed that the letter meant that the Pulaski Crime was a felony.

5   Holt declared, "I provided SAS Chinn with a letter confirming that the suspended sentence was

6   still a felony; paraphrasing Shakespeare, "a felony is a felony is a felony."  Holt Dec. ¶ 17; see

7   also Holt Dec. ¶¶ 15, 16.  Thus, had Chinn sought clarification from Holt about what was meant

8   by the letter, Holt would have simply reiterated his prior conclusion – that the Pulaski Crime was

9   a felony and that Zacharia was a felon.  See Holt Dec. ¶¶ 15-17; see also Chinn Dec. ¶¶ 29-31;

10  Merrilees Dec. ¶ 10.  This was already Chinn's understanding of the letter.  See DUMF 67;

11  Chinn Dec. ¶¶ 29, 30; see also Merrilees Dec. ¶ 10.  Chinn's failure to clarify Holt's letter is not

12  material.

13         Zacharia also criticizes Chinn's reliance on the opinions of Holt and Merrilees.  It is not

14  improper, but is in fact advisable, to seek the opinions of district attorneys or deputy attorney

15  generals.  See Ewing v. City of Stockton, 588 F.3d 1218, 1231 (9th Cir. 2009).  With respect to

16  Merrilees, she acknowledged that she is not an expert on Arkansas law.  See DUMF 50.

17  Merrilees, whose job duties included advising officers like Chinn, initially gave Chinn an

18  opinion about what the Pulaski Documents indicated, and then advised Chinn to obtain the

19  opinion of an expert on Arkansas law.  Chinn then contacted the Arkansas Attorney General's

20  office and obtained the opinions of Holt, who has expertise in Arkansas law.  See  DUMF's 53-

21  57.  Once Holt's opinion was obtained concerning the Pulaski Documents, Merrilees rendered

22  her opinion that Zacharia was in violation of Penal Code § 12021.  There is nothing unreasonable

23  about Chinn's conduct in obtaining the opinions of Merrilees and Holt.  It is true that the advise

24  of an attorney will not per se insulate a police officer from 42 U.S.C. § 1983 liability.

25  See Ewing, 588 F.3d at 1231.  However, Zacharia has failed to show how Chinn's reliance was

26  unreasonable, or why Holt's and Merrilees's respective opinions should not have been

27  considered in determining whether probable cause existed.  The Pulaski Documents showed a

28  guilty plea to a felony, which strongly indicated that Zacharia was a felon, and Holt's opinion

was meant to ensure the Pulaski Documents accurately reflected that a felony existed.  Holt's

opinion strengthened the probative force of the Pulaski Documents.

Finally, Zacharia contends that Chinn should have conducted an independent

investigation into the legal effect of the Pulaski Crime.  The Court takes Zacharia to mean that

Chinn should have done more research into the Pulaski Crime and the Pulaski Documents.

Perhaps additional research would have revealed that the Pulaski Crime was not a felony

conviction.  This is far from certain considering that a motion in limine to determine this very

issue was denied by District Judge Wanger in the federal prosecution.  See Doc. Nos. 18 & 32 in

case 1:06-CR-310 OWW.  Nevertheless, as advisable as further research and investigation may

have been, it was not required.  As discussed, the Pulaski Documents reflect a guilty plea to a

felony.  Further clarification was sought and obtained from the Arkansas Attorney General's

office about whether the Pulaski Documents reflect "some sort of conviction" or whether there

had been a pardon or expungement.  See DUMF's 52, 58.  When Holt confirmed that there was

no pardon or expungement, that there was a felony conviction, and that Zacharia was a felon, no

further clarification was needed because there was a fair probability that Zacharia was in

violation of Penal Code § 12021(a)(1).  It is unnecessary to "provide more facts than necessary to

show a 'fair probability' that [Zacharia] had committed a crime."  Gourde, 440 F.3d at 1073.  In

addressing an argument that law enforcement officers should have done more in their

investigation of a computer related crime, the Ninth Circuit stated:

> Whether the FBI could have obtained verification of Gourde's downloads through
> a digital examination of the computer is the wrong question to answer. In any
> event, the benchmark is not what the FBI "could have" done.  An affidavit may
> support probable cause even if the government fails to obtain potentially
> dispositive information.  See United States v. Miller, 753 F.2d 1475, 1481 (9th
> Cir. 1985) (holding that an affidavit supported probable cause even though
> "independent verification could have been easily accomplished in this case" and
> the "officers failed to take these simple steps"); United States v. Ozar, 50 F.3d
> 1440, 1446 (8th Cir. 1995) ("The magistrate judge erred in focusing his Franks v.
> Delaware analysis on what the FBI could have learned with more investigation . .
> . ."); United States v. Dale, 991 F.2d 819, 844 (D.C. Cir. 1993) (noting that
> "failure to investigate fully is not evidence of an affiant's reckless disregard for
> the truth" and that "probable cause does not require an officer to . . . accumulate
> overwhelming corroborative evidence.")

Gourde, 440 F.3d at 1073 n.5.  As Gourde and the cases it cites makes clear, it was not necessary

for Chinn to continue to investigate and accumulate evidence.

1   In summary, the Pulaski Documents and the information and opinions from Small, Holt,

2   and Merrilees created a fair probability that Zacharia was in violation of Penal Code § 12021.

3   This information was relayed by Chinn in his warrant application.  Chinn had probable cause,

4   and the search warrant application established probable cause.  Summary judgment in favor of

5   Chinn on this theory is appropriate.

6       2.     Judicial Deception

7       *Defendant's Argument*

8   Chinn argues that there was no judicial deception since there was no known falsehood

9   included in the warrant application.  Chinn argues that he conducted his investigation in good

10  faith and relied on the opinions of Merrilees and Holt.  The opinions of Merrilees and Holt are

11  the type of opinions that officers reasonably rely upon in obtaining warrants.

12      *Plaintiff's Opposition*

13  Zacharia argues that the search warrant was based on Chinn's declaration.  In that

14  declaration, Chinn swore that he received certified copies of the "felony conspiracy conviction."

15  The warrant also states that Chinn received a letter from Holt "confirming" that Zacharia's

16  sentence was suspended but that his "conviction" was still a felony.  However, under Arkansas

17  law, Zacharia was not convicted of a felony and Holt's letter is ambiguous (and only two

18  sentences long).  Thus, the warrant contained false representations.

19      *Leal Standard*

20  A warrant obtained through 'judicial deception' violates the Fourth Amendment.  See

21  Franks v. Delaware, 438 U.S. 154, 170-71 (1978); Butler v. Elle, 281 F.3d 1014, 1024 (9th Cir.

22  2002).  "To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant

23  deliberately or recklessly made false statements or omissions that were material to the finding of

24  probable cause."  Greene v. Camreta, 588 F.3d 1011, 1035 (9th Cir. 2009); KRL v. Moore, 384

25  F.3d 1105, 1117 (9th Cir. 2004).  A plaintiff's showing of a deliberate falsehood or reckless

26  disregard for the truth must be substantial.  Ewing v. City of Stockton, 588 F.3d 1218, 1224 (9th

27  Cir. 2009); Butler, 281 F.3d at 1024.  "Omissions or misstatements resulting from negligence or

28  good faith mistakes will not invalidate an affidavit which on its face establishes probable cause."

1   Ewing, 588 F.3d at 1224; United States v. Smith, 588 F.2d 737, 740 (9th Cir. 1978). "Nor may a

2   claim of judicial deception be based on an officer's erroneous assumptions about the evidence he

3   has received." Ewing, 588 F.3d at 1224; Smith, 588 F.2d at 739-40. "The court determines the

4   materiality of alleged false statements or omissions." KRL, 384 F.3d at 1117; Butler, 281 F.3d at

5   1024. In the case of false statements, "the court purges those statements and determines whether

6   what is left justifies issuance of the warrant." Ewing, 588 F.3d at 1224; see also Greene, 588

7   F.3d at 1035; Butler, 281 F.3d at 1024. In the case of omissions, "the court determines whether

8   the affidavit, once corrected and supplemented [with the omitted facts], establishes probable

9   cause." Ewing, 588 F.3d at 1224; see Liston v. County of Riverside, 120 F.3d 965, 973 (9th Cir.

10  1997).

11       *Discussion*

12       There is insufficient evidence of actionable judicial deception. Chinn's search warrant

13  application, which is Defendant's Exhibit J, accurately relates the investigation. Chinn

14  explained the reasons for his conclusion that Zacharia had a felony conviction, which included a

15  description of Chinn's conversations with Small, Merrilees, and Holt. Importantly, Chinn

16  attached copies of the Pulaski Documents, as well as Holt's complete correspondence. Since

17  Holt's entire correspondence was included as part of the warrant application, the Madera Court

18  was able to completely review and interpret Holt's correspondence. Even if the Pulaski Crime is

19  not a felony conviction, as discussed above, there was nothing unreasonable or reckless about

20  Chinn relying on the opinions of Merrilees and Holt regarding the Pulaski Documents. Once

21  Chinn had probable cause, he was not required to investigate further. See Gourde, 440 F.3d at

22  1073 n.5. Chinn's conduct, conclusions, and bases for his conclusions were disclosed and

23  provided to the Madera County Superior Court in the search warrant application. There has been

24  no "substantial showing" that Chinn made a deliberate falsehood or acted in reckless disregard

25  for the truth in his search warrant application. See Ewing, 588 F.3d at 1224; Butler, 281 F.3d at

26  1024. Summary judgment in favor of Chinn on this theory is appropriate.

27       3.   Unreasonable Handcuffing

28       In his opposition, Zacharia cites from *Meredith v. Erath*, 342 F.3d 1057, 1061-62 (9th

Cir. 2003).  <u>See</u> Court's Docket Doc. No. 80 at 3-14.  The cited section of *Meredith* deals with handcuffing as a violation of the Fourth Amendment.  However, as Chinn correctly points out, the Second Amended Complaint ("SAC") does not allege that handcuffing violated Zacharia's Fourth Amendment rights.  Instead, the SAC alleges that defendants deprived Zacharia "of his liberty by unlawfully and maliciously arresting him without probable cause in violation of the [4th] and [14th] Amendments to the United States Constitution."[29]  SAC ¶ 36.  The SAC does not mention handcuffing.  "A plaintiff cannot raise a new theory of liability in [his] opposition to a motion for summary judgment or summary adjudication."  <u>Torres v. City of Madera</u>, 655 F. Supp. 2d 1109 (E.D. Cal. 2009) (citing *inter alia* <u>Coleman v. Quaker Oats Co.</u>, 232 F.3d 1271, 1292-93 (9th Cir. 2000)); <u>Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co.</u>, 520 F.Supp.2d 1184, 1193 n.9 (C.D. 2007).  To the extent Zacharia complains about being handcuffed, that complaint or theory cannot stop summary judgment.  <u>See</u> <u>id.</u>

## II.    <u>THIRD CAUSE OF ACTION – *Monell* "POLICY & CUSTOM"</u>

Chinn argues that he cannot be held liable for improper policies and customs because these are *Monell* theories that are applicable to municipalities.  Zacharia has not responded to this argument or challenged Chinn's characterization of the third cause of action.  In the absence of clarification and citation to authority from Zacharia, or evidence to support some form of supervisory liability theory, summary judgment on the third cause of action is appropriate.  <u>See</u> <u>Preschooler II v. Clark County Sch. Bd. of Trs.</u>, 479 F.3d 1175, 1183 (9th Cir. 2007) (discussing supervisor liability); <u>McGrath v. Scott</u>, 250 F.Supp.2d 1218, 1222-23 (D. Ariz. 2003) (discussing supervisor liability and *Monell* liability).

## III.    <u>FIRST CAUSE OF ACTION – EQUAL PROTECTION</u>

### *Defendant's Argument*

Chinn argues that the only evidence of racial animus is deposition testimony from Zacharia.  After consulting with counsel, Zacharia asserted that Chinn, while executing the 2006

---

[29]The Court notes that Plaintiff agrees that he was not arrested in 2006, just detained.  <u>See</u> DUMF's 93, 94.

1   search warrant, used the term "Lebanese."  Zacharia testified that Chinn indicated that Zacharia

2   was a terrorist and a Lebanese gun dealer.  However, Chinn did not call Zacharia a terrorist or

3   mention heritage.  Further, as the facts demonstrate, Chinn engaged in a legitimate and

4   significant investigation and that investigation indicated that Zacharia was violating California

5   gun laws.  The single alleged statement is not sufficient to show discriminatory animus.

6           *Plaintiff's Opposition*

7           Zacharia's opposition does not expressly address his equal protection claim.  However, in

8   a footnote addressing conspiracy, Zacharia identifies as a relevant consideration "[Chinn's]

9   allusions durintg the complained of false arrest to Plaintiff's national origin (and being out of

10  business)."  Doc. No. 80 at p. 12 n.10.  In other words, for his equal protection claim, Zacharia

11  essentially relies on his own testimony regarding Chinn's statements during the 2006 search.

12          *Relevant Deposition & Declaratory Testimony*

13          In his deposition, Zacharia testified:

14  Q:    Okay.  Why do you believe that Mr. Chinn discriminated against you?

15  **A:    I think it was brought up that Mr. Zacharia is of Lebanese descent, that's one thing,
         so I believe that the Lebanese thing was brought up more than once.**

16

17  Q:    How was that brought up?  Tell me the context.
    . . . . . . .

18  **A:    Other than the fact that the way he treated me all along led me to believe that it's a
         big case of discrimination, because he never treated me fair.  I - - I didn't kill, I
19       didn't shoot, I didn't do anything wrong.  Never did, never have.  And I feel the
         whole thing was - - day after day he took me as a project to just continuously push
20       and harass, and throw me out of business as his words were.**

21  Q:    Did he ever say an words that used the word "Lebanese?"

22  **A:    The words were used, yes.  I remember that.  I remember - - if you're going to ask
         me where and when, what, which case it was, or what day it was, whether it was in
23       '02 or '06, I don't remember exactly.**

24  Q:    Okay.  What was said that related to Lebanese?

25  **A:    You're going to have to give me a few minutes not to think about it exactly.**

26  . . . . . .[30]

27

28          [30]The transcript indicates that Zacharia conferred with his counsel, and Chinn's counsel noted that
    consultation on the record.  See Zacharia Depo. at 88:22-89:4.

**A:** **The term I believe was not just Lebanese, because I was - - it was even worse than being Lebanese.  I was a terrorist, because I'm a Lebanese gun dealer and a pilot.**

Q:   Did Mr. Chinn call you a terrorist?

**A:** **All these things.  Not specifically that word or that word.  I mean he didn't say one word "terrorist."  He just - - I am trying to remember that, because I remember now exactly that I was . . . after the handcuffs, and after he threw the appares, and after he said, "You're out of business."**

Q:   And that was in 2006?

**A:** **Yes.**

Q:   What did he say?

**A:** **"I finally got you.  I should have got you four or five years ago."  And he would leave, came back, and referred to me, "I should have got you four years ago.  I knew all along.  You're a terrorist," something "Lebanese."**

Zacharia Depo. at 87:21-90:3; DUMF's 95, 96, 97.

In relation to the above quoted deposition testimony, Chinn offered the following undisputed fact: "At no time during the execution of the search warrant on June 21, 2006, nor at any other time whatsoever, did SAS Chinn refer to Zacharia as 'terrorist,' 'Lebanese terrorist,' or in any other manner connoting terrorist or ethnic ties."  DUMF 98.  Zacharia responded to DUMF 98 as follows:  "Undisputed in as much as to the exact quoted language.  However, it was implied to the Plaintiff."  PRDUMF 98.

Finally, Chinn has declared that he: (1) abhors the unequal treatment of people on account of their race, ethnicity, national origin, or any other protected status; (2) did not act because of Zacharia's race, ethnicity, national origin, or any other protected status; and (3) never entered into any agreement or acted in concert with anyone to violate the rights of Zacharia.  See Chinn Dec. ¶¶ 53, 54, 55.

*Legal Standard*

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003); Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001).  A plaintiff must show that the "defendants acted with an intent or purpose to

1   discriminate against the plaintiff based upon membership in a protected class." Byrd v. Maricopa

2   County Sheriff's Dept., 565 F.3d 1205, 1212 (9th Cir. 2009); Serrano, 345 F.3d at 1082. That is,

3   a plaintiff must show that the defendant "acted in a discriminatory manner and that the

4   discrimination was intentional." Bingham v. City of Manhattan Beach, 341 F.3d 939, 948 (9th

5   Cir. 2003);[31] Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740 (9th Cir. 2000).

6   "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's

7   protected status." Serrano, 345 F.3d at 1082; Maynard v. City of San Jose, 37 F.3d 1396, 1404

8   (9th Cir. 1994). In order to avoid summary judgment, a plaintiff "must produce evidence

9   sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the

10  decision was racially motivated." Serrano, 345 F.3d at 1082; Bingham, 341 F.3d at 949.

11  However, evidence that the plaintiff and the defendant are of a different race/ethnicity combined

12  with a disagreement as to the reasonableness of the defendant's conduct toward the plaintiff is

13  alone insufficient to show a violation of the Equal Protection Clause. Bingham, 341 F.3d at 949;

14  see also Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir. 2005).

15      *Discussion*

16      Zacharia's testimony is not particularly clear. Zacharia initially testified that he did not

17  know when or where Chinn used the term Lebanese, but then testified that in 2006 Chinn told

18  Zacharia that he was out of business and then said "something, 'Lebanese.'" See Zacharia Depo.

19  at 90:2-3. Further, Zacharia at one point indicated that Chinn used the term "terrorist," but at

20  another point Zacharia testified that the word "terrorist" was not used. Cf. Zacharia Depo. at

21  90:1-3 with Zacharia Depo. at 89:14-16. In response to Chinn's proposed fact that he did not use

22  the terms "terrorist" or "Lebanese terrorist," or say anything connoting terrorism or ethnic ties,

23  see DUMF 98, Zacharia did not flatly dispute the contention. Instead, Zacharia stated that there

24  was no dispute as to the quoted language, but that Chinn gave an impression. See PRDUMF 98.

25  Piecing together Zacharia's testimony, DUMF 98, and PRDUMF 98, the Court concludes that

26  there is no genuine dispute regarding Chinn's use of the word "terrorist" – Chinn did not use that

27

28          [31]Overruled on other grounds, Edgerly v. City & County of San Francisco, 599 F.3d 946, 956 n.14 (9th Cir. 2010).

word.  See DUMF 98; PRDUMF 98; Zacharia Depo. 89:14-16.  PRDUMF 98 indicates that

Chinn did not use the terms "terrorist" or "Lebanese terrorist" because those terms are in

quotation marks in DUMF 98.  There is also no genuine dispute regarding whether Chinn gave

the "impression" of terrorism.  Zacharia's testimony regarding terrorism or terrorist at best

indicates that Zacharia simply had a subjective feeling that Chinn thought that Zacharia was a

terrorist.  Such a subjective feeling is insufficient.  See Collins v. Perez, 2008 U.S. Dist. LEXIS

11079, *18 (E.D. Cal. Feb. 14, 2008); Berg v. California Horse Racing Bd., 419 F.Supp.2d 1219,

1231 (E.D. Cal. 2006); see also Anthoine v. North Cent. Counties Consortium, 605 F.3d 740,

753 (9th Cir. 2010); Edington v. Yavapai County, 357 Fed. Appx. 888, 890 (9th Cir. 2009); cf.

Cerrillo v. West Park Elem. Sch. Dist., 2009 U.S. Dist. LEXIS 118223, *47-*49 (E.D. Cal. Dec.

17, 2009) (and cases cited therein).  However, Zacharia testified that Chinn used the word

"Lebanese."  See Zacharia Depo. 88:15-17.  Further, DUMF 98's contention regarding Chinn's

use of words connoting ethnic ties is not in quotation marks.  See DUMF 98; cf. PRDUMF 98.

Viewing the testimony in the light most favorably to Zacharia, the Court will analyze Zacharia's

equal protection argument with the understanding that Chinn said that he should have had

Zacharia four years ago, that Zacharia "knew all along," and in some unknown way used the term

"Lebanese."  See Zacharia Depo. 90:1-3.

Chinn argues that, even accepting Zacharia's testimony, that testimony is insufficient

evidence under *Federal Deposit Ins. Corp. v. Henderson*, 940 F.2d 465 (9th Cir. 1991).  In

*Henderson*, the former president of a minority-owned bank contended that the actions of bank

regulators caused his removal from the bank's board of directors.  The Ninth Circuit found

insufficient evidence of racial animus and thus, no equal protection claim.  After finding

insufficient indirect evidence of discrimination, the Ninth Circuit explained:

> Lastly, we consider [the regulator] Oldfield's refusal to authorize Liberty to open
> a branch office in downtown Seattle. Unlike [president] Wood's other allegations,
> this contention is accompanied by direct evidence that Wood argues establishes a
> genuine factual question as to Oldfield's motivations.  While we agree that
> Oldfield's statement - "Who's going to bank with you downtown? After all,
> you're a minority bank." - might support an inference of discriminatory intent,
> that does not end our inquiry.  In order to defeat Oldfield's motion for summary
> judgment, Wood had the burden of producing evidence sufficient to create a
> genuine factual question as to Oldfield's motivations. A factual dispute is genuine
> only "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." In the context of this case, Wood must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that Oldfield's decision not to authorize the branch opening was racially motivated. Especially given the context in which the statement was made, we find that Wood has failed to meet that burden.

Oldfield had a legitimate reason for refusing to authorize the opening of a branch office downtown. Examinations dating from before his tenure as Supervisor indicated that the Bank had serious liquidity and managerial problems. It was entirely reasonable for Oldfield to demand that those problems be addressed before permitting the Bank to expand its operations. In light of this fact, we do not find the statement attributed to Oldfield to be sufficient evidence to create a genuine issue of fact as to his motivations in refusing to approve the branch application.

To hold otherwise would be to make summary judgment unavailable in all cases where the plaintiff has alleged direct evidence of discriminatory intent. Aside from the troubling practical implications of such a holding, we find no authority for creating a presumption whereby a plaintiff is held to have established a genuine factual issue merely by alleging direct evidence. In analyzing a motion for summary judgment, the district court reviews the evidence to determine not merely whether there is a factual dispute between the parties, but whether there is a genuine factual dispute. An allegation of direct evidence will almost always assist a plaintiff in meeting this burden, but such an allegation does not eliminate the genuineness requirement.

In short, the evidence offered by Wood does not support an inference that Oldfield's actions toward Liberty were racially motivated, and indeed his actions were eminently reasonable in light of the increasingly negative reports on the Bank's condition. There being no genuine issue of material fact, the district judge properly granted Oldfield's motion for summary judgment on the equal protection claim.

Henderson, 940 F.3d at 473-74. Zacharia does not discuss or distinguish *Henderson*.

Although not cited by the parties, in a subsequent case, the Ninth Circuit relied on similar reasoning to deny an equal protection claim. *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227 (9th Cir. 1994) involved land use ordinances and development plans that affected land owned by individuals of Japanese/Asian decent. In finding no equal protection violation, the Ninth Circuit in part explained:

The strongest evidence of discriminatory intent consists of two statements made by Doris Olsen, a member of the City Council, to Stephanie Forrest, the Kawaokas' real estate agent, and Cheryl Christner, Ms. Forrest's assistant. Forrest contends that when informed that the City's designation of the Kawaokas' property had decreased its value, Olsen stated "Why should these Japanese people make all that money?" and "Why should these people make so much money?" These deplorable remarks are insensitive and disturbing and are evidence of prejudice. However, they are insufficient to raise a claim that the governmental action was on account of racial discrimination.

The district court analogized this situation to *Federal Deposit Ins. Corp. v.*

27

1    *Henderson*, 940 F.2d at 465.  See Kawaoka, 796 F. Supp. at 1330-31. In
2    Henderson, a president of a minority-owned bank sued a federal bank regulator
     who encouraged the bank's board of directors to fire the president.  940 F.2d at
3    465.  To support his claim of racial discrimination, the plaintiff pointed to a
     statement by the bank regulator from which one might infer discriminatory intent.
4    Because we found rational reasons for the regulator's actions, including a federal
     report on the bank that stated that the president's "unsatisfactory management has
5    resulted in the bank's current insolvent condition," we ruled that one statement
     without additional evidence of racial discrimination was insufficient to state a
6    claim.  Id. at 469, 473 & n.16.  In the present case, given the many reasons
     articulated by the City to support its decisions, including the desire to preserve
7    agriculture and the City's small-town character, its concern that infrastructure
     might not support immediate development, and its concerns about the water
8    adequacy and increase in traffic, Olsen's repugnant statements are insufficient to
     demonstrate that she acted with discriminatory intent.

9    Kawaoka, 17 F.3d at 1239.

10        The Court cannot conclude that Chinn's single use of the term "Lebanese" is sufficient

11   evidence of racial animus in this case.  First, Chinn has declared that he harbored no racial

12   animus and abhors racial discrimination.  Second, Chinn's precise statement is less than clear,

13   and the single use of the term "Lebanese" seems to be similar to the statements in *Henderson* and

14   *Kawaoka*.  Third, *Henderson* and *Kawaoka* suggest that direct evidence of racial animus may be

15   insufficient to defeat summary judgment in light of significant evidence of a non-discriminatory

16   reasons for challenged conduct.  Here, as discussed above, there was sufficient evidence of

17   probable cause that Zacharia was guilty of being a felon in possession of a firearm.  In 2002,

18   Chinn received information from Small that indicated that Zacharia acknowledged a conviction

19   in Arkansas.  Also in 2002, Chinn's investigations led to the seizure of assault weapons and the

20   filing of criminal charges.  In June 2006, Chinn received a copy of the Pulaski Documents which

21   indicated a guilty plea to a felony.  Chinn consulted with a Cal-DOJ attorney.  Chinn consulted

22   with an Arkansas DOJ attorney.  Chinn investigated representations made by Zacharia in the

23   various weapons permitting processes.  Chinn submitted the Pulaski Documents, submitted his

24   correspondence from Holt, and accurately described his investigation to the Madera County

25   Superior Court.  Chinn believed that probable cause existed that Zacharia was in violation of

26   Penal Code § 12021(a)(1), Merrilees believed that Zacharia was in violation of Penal Code §

27   12021(a), Holt believed that Zacharia had the status of a felon because of the Pulaski Crime, the

28   Madera County Superior Court found that there was probable cause, and there is no dispute that

1   Penal Code § 12021(a)(1) raises significant public safety concerns.  See People v. Shear, 71

2   Cal.App.4th 278, 288 (1999); cf. District of Columbia v. Heller, 128 S.Ct. 2783, 2816-17 (2008).

3   The evidence shows that there was probable cause to obtain a search warrant.

4          In light of the facts establishing probable cause, the nature of the search warrant

5   application (which included copies of the pertinent documents and correspondences), Chinn's

6   declaration, Zacharia's ambiguous testimony as to Chinn's use of the term "Lebanese," and

7   Zacharia's failure to distinguish or address Henderson, Zacharia's testimony is insufficient to

8   create a genuine triable issue.  Summary judgment in favor of Chinn is appropriate.  See

9   Kawaoka, 17 F.3d at 1239; Henderson, 940 F.3d at 473-74.

10

11   **IV.      FOURTH & FIFTH CAUSE OF ACTION – 42 U.S.C. §§ 1985(2), 1985(3)**[32]

12          42 U.S.C. § 1985 prohibits conspiracies to interfere with civil rights.  See Karim-Panahi

13   v. Los Angeles Police Dep't, 839 F.2d 621, 626 (9th Cir. 1988).  However, the Court has found

14   no violation of 42 U.S.C. § 1983.  "The absence of a [42 U.S. C. §] 1983 deprivation of rights

15   precludes a [42 U.S.C. §] 1985 conspiracy claim predicated on the same allegations."  Thornton

16   v. City of St. Helens, 425 F.3d 1158 (9th Cir. 2005); Caldeira v. County of Kauai, 866 F.2d 1175,

17   1182 (9th Cir. 1989); see also Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 930 (9th Cir.

18   2004).  Also, the Court has found insufficient evidence of discriminatory animus and thus, no

19   equal protection violation.  Without class based discriminatory animus, there can be no violation

20   of 42 U.S.C. § 1985.  See Portman v. County of Santa Clara, 995 F.2d 898, 908-09 (9th Cir.

21   1993); Caldeira, 866 F.2d at 1182.  Additionally, 42 U.S.C. §§ 1985(2) and 1985(3) require the

22   existence of a conspiracy, that is an "an agreement or meeting of the minds," Franklin v. Fox,

23   312 F.3d 423, 441 (9th Cir. 2002), to deprive a person of equal protection.  Addisu v. Fred

24   Meyer, Inc., 198 F.3d 1130, 1141 (9th Cir. 2000).  However, Chinn has declared that he did not

25   conspire with anyone, see Chinn Dec. ¶ 55, and Chinn's interactions with Madera police officers,

26   Merrilees, and Holt appear to be nothing more than typical aspects of an investigation.  There is

27

28          [32]Zacharia's claim under 42 U.S.C. § 1985(2) is based on the second clause, denial of equal protection.  See
     SAC at pp. 13-15.  As such, the Court's discussion does not apply to the first clause of 42 U.S.C. § 1985(2), which
     concerns access to federal courts.  See Portman v. County of Santa Clara, 995 F.2d 898, 908-09 (9th Cir. 1993).

1   insufficient evidence of an agreement or a meeting of the minds between Chinn and any other

2   person to deprive Zacharia of equal protection.  Summary judgment in favor of Chinn on

3   Zacharia's 42 U.S.C. § 1985 conspiracy claims is appropriate.

4

5                                      **CONCLUSION**

6          Chinn moves for summary judgment on the claims alleged against him.  With respect to

7   Zacharia's Fourth Amendment claims, the evidence establishes that, based on the Pulaski

8   Documents, the information from Small, and the opinions of Holt and Merrilees, Chinn had

9   probable cause to believe that Zacharia was in violation of Penal Code § 12021(a)(1).  Chinn was

10  not required to conduct further investigation.  Also, the warrant application and the attached

11  documents establish probable cause, and Zacharia has not presented substantial evidence that

12  Chinn intentionally or recklessly disregarded the truth in the search warrant application.  Also,

13  the complaint does not include a claim for unreasonable handcuffing.  Finally, the

14  *Monell* allegations are not applicable to Chinn.  Accordingly, summary judgment in favor of

15  Chinn on Zacharia's Fourth Amendment claims is appropriate.

16         With respect to the Equal Protection claim, the evidence does not create a genuine dispute

17  because the only evidence of racial animus is isolated and ambiguous at best, the evidence

18  established probable cause that Zacharia was in violation of Penal Code § 12021(a)(1), and

19  Chinn has declared that race did not affect his decisions.  Summary judgment in favor of Chinn

20  on Zacharia's Fourteenth Amendment claim is appropriate.

21         With respect to the 42 U.S.C. § 1985 claims, because there is insufficient evidence of

22  racial animus, insufficient evidence of a conspiracy, and no violation of 42 U.S.C. § 1983, there

23  can be no liability under 42 U.S.C. § 1985.  Summary judgment in favor of Chinn on Zacharia's

24  42 U.S.C. § 1985 claim is appropriate.

25  //

26  //

27  //

28  //

30

1        Accordingly, IT IS HEREBY ORDERED that:

2   1.    Defendant Ignatious Chinn's motion for summary judgment is GRANTED;

3   2.    All currently scheduled dates, including the pre-trial and trial dates, are VACATED;

4   3.    The Clerk shall enter judgment in favor of Defendant Chinn; and

5   4.    The Clerk shall CLOSE this case.

6

7   IT IS SO ORDERED.

8

Dated:    September 10, 2010

9                                           CHIEF UNITED STATES DISTRICT JUDGE